**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
YASMIN VARGAS,
     Plaintiff,
  -against-

18-CV-4760 (AJN) (OTW)

**REPORT & RECOMMENDATION**

ANDREW M. SAUL, Commissioner
of Social Security,[1]
     Defendant.
-------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

**TO THE HONORABLE ALISON J. NATHAN, United States District Judge,**

I. **Introduction**

Plaintiff brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. §405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") and disability insurance benefits ("DIB"). The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF 13). Plaintiff did not file a response. For the reasons set forth below, I recommend that the Commissioner's Motion for Judgment on the Pleadings be **DENIED**, and that the case be remanded for further proceedings pursuant to 42 U.S.C. §405(g).

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Andrew M. Saul for former Acting Commissioner Nancy A. Berryhill.

II. **Statement of Facts**

    A. **Procedural Background**

Plaintiff applied for SSI and DIB on December 2, 2014, alleging that she became disabled due to anemia-fibroid surgery, bipolar disorder, and acid reflux. (Tr. 78).[2] Plaintiff alleged an inability to function or work as of August 2, 2011. *Id.*

Plaintiff's applications were initially denied on February 3, 2015. (Tr. 87). After Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), ALJ Laura Michalec Olszewski conducted a hearing on April 20, 2017, in which both Plaintiff, represented by counsel, and vocational expert Pat Green provided testimony. (Tr. 38, 60). After the hearing, ALJ Olszewski kept the record open nineteen days to permit Plaintiff to submit additional medical records, but no additional records were ultimately submitted to the ALJ. (Tr. 17). On June 27, 2017, ALJ Olszewski issued a decision finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 28).

On July 27, 2017, the Appeals Council received Plaintiff's request for review of the ALJ's action in the case and allowed Plaintiff to submit additional information. (Tr. 9). On March 29, 2018, after considering Plaintiff's newly submitted evidence, the Appeals Council issued an order denying Plaintiff's appeal. (Tr. 1). Plaintiff then filed her complaint with this Court on May 29, 2018. (ECF 2).

---

[2] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed in accordance with 42 U.S.C. § 405(g). (*See* Administrative Record, dated September 4, 2018, ECF 12 ("Tr.")).

B. <u>**Social Background**</u>

Plaintiff is a sixty-year-old widow with no children. (Tr. 42, 406). Her highest level of education was completing the tenth grade. (Tr. 42). Plaintiff described having an abusive childhood. (Tr. 402). Plaintiff acknowledged that she drinks a bottle of beer or wine every week, and smokes three to four cigarettes daily. (Tr. 358).

At the time of the ALJ hearing, Plaintiff was living in an apartment with a friend. (Tr. 42). The friend works and pays all their bills, including rent. (Tr. 42-43). Plaintiff reports being able to travel independently and takes public transportation. (Tr. 43).

Plaintiff worked for eight years at Benetton's retail store, working primarily in sales. *Id.* Before Benetton, Plaintiff worked at a variety of other retail stores. (Tr. 47). Plaintiff stopped working in 2011 after Benetton went out of business. (Tr. 45). Although Plaintiff spent the next three years looking for other jobs, she eventually stopped her job search and began relying on public assistance. (Tr. 46).

C. <u>**Medical Records – Mental Health**</u>

1. **Harlem Hospital Center**

On June 19, 2013, Plaintiff was hospitalized from an overdose in an attempt to "feel numb." (Tr. 298). Dr. Nurur Rahman diagnosed Plaintiff with dysthymic disorder. *Id.* Plaintiff later described the incident to ALJ Olszewski as a suicide attempt. (Tr. 55). Plaintiff saw Dr. Rahman again for bipolar disorder in July 2013 but was discharged because Dr. Rahman concluded that Plaintiff "does not have a mental illness for which in-patient care and treatment in a hospital is appropriate." (Tr. 289).

3

## 2. Emma L. Bowen Community Center ("Upper Manhattan Mental Health Center")

On March 18, 2014, Plaintiff visited Upper Manhattan Mental Health Center ("UMMHC") at the suggestion of her then-boyfriend. (Tr. 408). Plaintiff acknowledged that she had been diagnosed with bipolar disorder in the past, but that she stopped taking medication for it because she thought she was "cured." (Tr. 402). Mark Roman, the social worker who met with Plaintiff, found Plaintiff to be "anxious" and referred her for psychiatric and physical evaluations. (Tr. 408).

When Plaintiff met with psychiatrist Dr. A. Pierre on April 1, 2014, Plaintiff shared that she had been suffering from sadness, crying spells, anhedonia, and insomnia since she was a teenager. (Tr. 396). Dr. Pierre noted Plaintiff's prior history of sexual abuse as a minor and that Plaintiff had run away from home at least four times as a minor. (Tr. 397). Plaintiff experienced mood swings and admitted having problems interacting with other people. (Tr. 398, 400). Dr. Pierre re-stated Plaintiff's prior diagnosis of mixed bipolar disorder and prescribed Abilify and hydroxyzine. (Tr. 400).

On February 23, 2017, Plaintiff met with psychiatrist Dr. Deepika Singh for her bipolar disorder and reported that while medication was helping her mood, she was still "not a 100%." (Tr. 366). Plaintiff reported no longer hearing voices in her head and exhibited a euthymic mood. *Id*. Dr. Singh prescribed Abilify, hydroxyzine, Prozac, and Ambien. *Id*.

## 3. Ryan Community Health Center ("Ryan Center")

Plaintiff saw Dr. Vivian Jones for chest pain at the Ryan Community Health Center. (Tr. 386). As part of the administered depression screening, Plaintiff answered that she felt little

interest in life and had trouble sleeping. *Id.* Dr. Jones diagnosed Plaintiff with depression, recommending that Plaintiff continue her medications and reach out for social support. (Tr. 390).

At her annual physical examination with Dr. Crissaris Sarnelli in November 2016, Plaintiff was advised to continue seeing her therapist to address her depression. (Tr. 431). Plaintiff reported that the medications were helping to manage her mood and that she felt "great." *Id*. Dr. Sarnelli agreed with Plaintiff's assessment that medication and therapy had kept Plaintiff's bipolar disorder "under control." (Tr. 374).

### 4. Industrial Medical Associates, P.C. ("IMA")

Plaintiff was referred to Dr. Aurelio Salon at IMA for a consultative internal medicine evaluation on January 20, 2015. (Tr. 357). Plaintiff complained of, *inter alia*, depression, loss of appetite, and suicidal thoughts. *Id*. Plaintiff shared that she had a history of overdose and had been diagnosed with depression four years prior. *Id*. Plaintiff admitted that she could cook, clean, do laundry, shop, and bathe by herself. (Tr. 358). As part of the mental status screening, Dr. Salon noted that Plaintiff maintained good eye contact, appeared oriented in all spheres, and denied suicidal ideations. (Tr. 359).

That same day, Plaintiff met with Dr. Lauren Feiden for a consultative psychiatric evaluation. (Tr. 414). Plaintiff reported that her depression had been ongoing since her teenage years, but that she felt her symptoms had worsened. *Id.* Plaintiff disclosed experiencing dysphoric moods, crying spells, hopelessness, difficulty getting out of bed, and insecurity. (Tr. 414-15). In addition, Plaintiff would suffer panic attacks related to flashbacks of her being raped as a teenager. (Tr. 415). Plaintiff also reported often daydreaming and would sometimes

5

"be in a daze." *Id.* Although Plaintiff could take public transportation and cook on her own, she often chose to stay at home, reading or listening to the radio, as a result of her depression. (Tr. 416). Plaintiff denied having any suicidal ideations, however, and did not exhibit any manic symptomatology. (Tr. 415). In response to her psychiatric issues, Plaintiff was seeing a therapist and a psychiatrist. (Tr. 414). Dr. Feiden concluded that Plaintiff's psychiatric problems "may significantly interfere with [her] ability to function on a daily basis," and Plaintiff would need assistance managing her own finances. (Tr. 417). Plaintiff was diagnosed by Dr. Feiden with Major Depressive Disorder and unspecified anxiety disorder. *Id*.

### 5. Plaintiff's Testimony

In her January 2015 Function Report, Plaintiff acknowledged being able to follow instructions and denied having problems getting along with people in authority. (Tr. 248). Plaintiff pointed out, however, that she struggled with forgetfulness and stress, and also experienced nervousness when talking with others. (Tr. 249, 252). As a result, Plaintiff categorized herself as "antisocial" and preferring to "be alone." (Tr. 246, 247). Plaintiff also filled out a related activities form in which she stated that she cooked three times a week and could do laundry by herself. (Tr. 258).

In her disability report, Plaintiff reported often feeling depressed due to her bipolar disorder. (Tr. 261). Plaintiff also attributes her missed doctors' appointments to her anxiety at leaving the house. *Id*. Most days, Plaintiff found it difficult to get out of bed, which Plaintiff attributed to her depression. *Id*. Plaintiff stated that she has suicidal thoughts daily and had previously attempted suicide. *Id*.

At the ALJ hearing, Plaintiff stated that she was unable to work because of her struggles with suicidal thoughts and depression. (Tr. 53). Plaintiff described a daily routine of getting up in the morning, brushing her teeth, and then returning to bed to sleep. (Tr. 48). Because of her depression, Plaintiff does not help with any household chores and relies on her housemate. (Tr. 49). During the day, Plaintiff would read or meditate, though she admitted she will get out of bed to make a sandwich when hungry. (Tr. 51, 53). Plaintiff claimed that she would have four or five days a week in which she isolates herself and does not engage in any sort of outside activity. (Tr. 48). Plaintiff described herself as antisocial and does not interact with family or friends. (Tr. 52). Although Plaintiff looked for a job for three years following the termination of her position with Benetton, she eventually stopped her job search due to "medical reasons." (Tr. 46).

### D. Medical Records – Physical Health

#### 1. Harlem Hospital

After her hospitalization at Harlem Hospital in June 2013 from a medication overdose, Plaintiff underwent a CT scan of her head and an X-ray exam of her chest. (Tr. 317, 318). Both test results showed no abnormalities. *Id*.

Plaintiff visited Harlem Hospital on July 15, 2013, complaining of dysuria,[3] urinary frequency, and vaginal pain. (Tr. 340). Plaintiff was diagnosed with cystitis[4] and dysuria. (Tr. 339). Plaintiff was discharged the same day and prescribed Ciprofloxacin. *Id*.

---

[3] Dysuria is the experience of pain during urination. *Dorland's Illustrated Medical Dictionary,* 585 (32d ed. 2012).
[4] Cystitis is "inflammation of the urinary bladder." *Dorland's Illustrated Medical Dictionary,* 463 (32d ed. 2012).

On October 1, 2013, Plaintiff visited Harlem Hospital again and met with Dr. Toni Wright for similar vaginal pain. (Tr. 331). Plaintiff exhibited no signs of distress during the physical exam but noted that she had run out of her Ciprofloxacin prescription. (Tr. 334). Before discharge, Plaintiff was advised on how to avoid urinary tract infections and was prescribed additional medication. (Tr. 331, 334).

Plaintiff returned to Harlem Hospital on December 30, 2013, meeting with Dr. Jamel Patterson for complaints of dysuria. (Tr. 326). Plaintiff was diagnosed with urinary tract infection and prescribed additional medication. (Tr. 327).

On August 12, 2014, Plaintiff returned to Harlem Hospital, complaining of "gyn[ecological] problems." (Tr. 324). Plaintiff did not appear to be in any physical distress. (Tr. 325). Plaintiff was diagnosed with a urinary tract infection and prescribed additional antibiotics. (Tr. 321).

### 2. Ryan Community Health Center

On November 30, 2015, Plaintiff met with Dr. Jones at the Ryan Center for intermittent chest pain and nausea. (Tr. 386). Plaintiff's physical examination showed no problems, and Plaintiff was advised to wean herself off smoking following her admission that she smoked six to ten cigarettes a day. (Tr. 388).

Plaintiff saw Dr. Sarnelli on September 13, 2016 for her urinary tract infection and was prescribed antibiotics. (Tr. 445-46). At Plaintiff's annual physical on November 14, 2016 with Dr. Sarnelli, Plaintiff raised concerns that she may have rheumatoid arthritis. (Tr. 456). Plaintiff reported that she experienced stiffness in her joints in the morning, but that pain relief medication helped. *Id*. At her December 15, 2016 follow-up appointment, Dr. Sarnelli notified

8

Plaintiff that the lab tests for rheumatoid arthritis were normal and advised Plaintiff to continue taking pain medication. (Tr. 454-55).

### 3. Empire Gate Medical Group

On February 20, 2014, Plaintiff met with Dr. Radhika Kapoor at Empire Gate Medical Group, complaining of chest discomfort that had been ongoing for approximately one year. (Tr. 353). Plaintiff was diagnosed with an upper respiratory infection and was recommended treatment with over-the-counter medications. (Tr. 356).

### 4. Industrial Medical Associates, P.C. ("IMA")

At the January 20, 2015 consultative evaluation with Dr. Salon described above, Plaintiff also complained of acid reflux and anemia. (Tr. 357). Dr. Salon found no physical abnormalities, including no musculoskeletal issues, and found that Plaintiff could walk and squat without discomfort. (Tr. 358-59). Dr. Salon further noted that Plaintiff did not appear to be in acute distress and that her gait and stance were normal. (Tr. 358). As a result, Dr. Salon determined that "there are no objective findings to support a fact that the claimant would be restricted in her ability to sit or stand, or in her capacity to climb, push, pull, or carry heavy objects." (Tr. 360).

### 5. Plaintiff's Testimony

In her Disability Report, Plaintiff listed that she had difficulty walking more than ten blocks and difficulty climbing up stairs, partially due to arthritis. (Tr. 248, 249). Plaintiff acknowledged that she has no problem being seated for prolonged periods and does not require any walking aid, *e.g.*, a cane or wheelchair. (Tr. 249). In her March 2, 2015 disability report, Plaintiff reported that walking causes difficulty breathing and occasional chest pain. (Tr.

261). Plaintiff also shared that leg cramps limit her ability to stand for more than thirty minutes at a time. *Id*.

At the ALJ hearing, Plaintiff indicated that she suffered from acute pain throughout her body, including "really, really bad arthritis." (Tr. 53, 57). Although Plaintiff was not receiving any regular treatment for the pain, she noted that the pain tended to "swell up over time," affecting her ability to stand for prolonged periods. (Tr. 57-58).

### E. Vocational Expert Testimony

ALJ Olszewski asked Dr. Pat Greene to consider a hypothetical person with an RFC similar to Plaintiff's and whether such a person could return to Plaintiff's prior job. (Tr. 62-63). Dr. Greene suggested that while someone with Plaintiff's RFC could not perform service-oriented work, as were Plaintiff's prior jobs, the national economy had a sufficient number of non-service-oriented unskilled jobs, such as hand packers and assemblers. (Tr. 63).

Dr. Greene further opined that employers would not tolerate employees being off-task for more than ten percent of a workday or being absent from the job more than once a month. *Id*. In response to a question from Plaintiff's counsel, Dr. Greene responded that employers likewise would not tolerate tardiness twice a week and would expect a certain decorum at work. (Tr. 64).

## III. Analysis

### A. Applicable Legal Principles

#### 1. Standard of Review

A motion for judgment on the pleadings should be granted if the pleadings make it clear that the moving party is entitled to judgment as a matter of law. However, the Court's review of

the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. Substantial evidence is more than a mere scintilla but requires the existence of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there exists contrary evidence. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may not determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a reasonable factfinder would *have to conclude otherwise*." *Id*.

### 2. Determination of Disability

To be awarded disability benefits, the Social Security Act requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step. 20 C.F.R. §404.1527.[5]

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits her ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's

---

[5] 20 C.F.R. §404.1527 applies here, rather than 20 C.F.R. §404.1520c, because Plaintiff filed her claim before March 27, 2017.

11

impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 ("Listings") such that she may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's RFC, or her ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC allows her to meet the physical and mental demands of her prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing some other work that exists in the national economy.

### B. ALJ's Decision

ALJ Olszewski issued an unfavorable decision for Plaintiff after applying the five-step process. (Tr. 19-27). At step two, ALJ Olszewski found only three of Plaintiff's impairments rose to the level of requisite severity: bipolar disorder, dysthymic disorder, and major depressive disorder. In contrast, ALJ Olszewski determined that Plaintiff's gastroesophageal reflux disease, arthritis, and urinary tract issues only caused a "minimal effect on the claimant's ability to work." (Tr. 20). At step three, ALJ Olszewski found that Plaintiff's severe impairments did not meet the criteria of any of the Listings such that she would be found presumptively disabled. (Tr. 21-23). ALJ Olszewski analyzed Plaintiff's limitations and found that Plaintiff's mental impairments did not impose extreme limitations, as required for paragraph B of listing 12.04 (depressive and bipolar disorders), or demand a highly structured setting, as required for paragraph C of listing 12.04. (Tr. 22-23).

ALJ Olszewski then found that Plaintiff had the RFC to perform work in low stress environments with minimal interactions with others. (Tr. 23-26). Based on that RFC, ALJ

12

Olszewski concluded that Plaintiff was unable to return to her past work as a cashier. (Tr. 26). ALJ Olszewski then referenced vocational expert Dr. Greene's testimony that Plaintiff could perform certain other jobs in the national economy. (Tr. 27). As a result, Plaintiff was deemed "'not disabled' for purposes of SSI and DIB. (Tr. 28).

### C. Analysis of ALJ's Decision
#### 1. Duty to Develop the Record

As an initial matter, the ALJ has a duty to develop the record, even where the plaintiff is represented by counsel. *Eusepi v. Colvin*, 595 Fed. Appx. 7, 9 (2d Cir. 2014). While the ALJ may not need to supplement the record when the record already contains sufficient evidence, the ALJ must seek out additional evidence where there are "obvious gaps' in the administrative record." *Id*. (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999)); *see also Velez v. Colvin*, No. 14-CV-3084 (CS)(JCM), 2017 WL 1831103, at *15 (S.D.N.Y. May 5, 2017) (remanding where there were months-long gaps in treatment notes). The ALJ's "duty to develop the record is particularly important where an applicant alleges [s]he is suffering from a mental illness[]." *Velez*, 2017 WL 1831103, at *15.

Here, the record only contains treatment notes from *three* visits to Plaintiff's mental health treating sources despite Plaintiff testifying that she saw a psychiatrist once a month and a therapist twice a month, apparently over a span of approximately three years. (Tr. 56).[6] Such a discrepancy should have indicated to the ALJ that there were obvious gaps in the record. For example, one document indicates that Plaintiff visited the UMMHC on June 10, 2014 despite there being no treatment notes from that visit in the record. (*See* Tr. 350). The Commissioner

---
[6] Plaintiff's treatment notes span from 2014 to 2017.

13

attempts to excuse these gaps by pointing to Plaintiff counsel's failure to obtain the necessary records from the UMMHC and Ryan Center. (ECF 14 at 13). The ALJ likewise highlighted "we have absolutely no mental health treatment records," but placed the burden solely on Plaintiff's counsel to procure the necessary reports and records. (Tr. 65-66). This ignores the ALJ's duty, even in counseled cases, to "affirmatively develop the record" rather than passively rely on the parties' submissions. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).[7]

Significantly, the record also contains no medical source statement from a treating source regarding the effect of Plaintiff's mental impairments, if any, on her ability to work.[8] The ALJ should request not only treatment notes, but also reports on "what an individual can still do despite a severe impairment," *i.e.*, a patient's physical or mental functional limitations. *See Hooper v. Colvin*, 199 F.Supp.3d 796, 812 (S.D.N.Y. 2016); *see also* 20 C.F.R. § 416.913(a)(2) (including medical opinions on ability to work as relevant evidence). Where the ALJ has failed to review a treating source's opinion on a patient's RFC, courts have routinely remanded the case. *See, e.g., Paredes v. Comm'r of Social Security*, No. 16-CV-810 (BCM), 2017 WL 2210865, at *19 (S.D.N.Y. May 19, 2017); *Sanchez v. Colvin*, No. 13-CV-6303 (PAE), 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015).

Although failure to obtain a medical opinion from a treating source does not *per se* require remand, courts excuse omission of a medical opinion only where the record was thorough enough to provide a basis to determine Plaintiff's RFC. *See, e.g., Swiantek v. Comm'r*

---

[7] It is also unclear whether Plaintiff's counsel diligently sought the mental health records. Plaintiff's counsel admitted at the ALJ hearing that he used the wrong plaintiff's name on the prehearing memo and expressed uncertainty of whether Plaintiff was ever diagnosed with arthritis. (Tr. 58-59).

[8] It appears that Plaintiff met with Dr. Sarnelli for completion of an SSI disability form for her physical impairments and was advised to have the mental health portion completed by her psychiatrist. (Tr. 362-63). It does not appear that the form was ever submitted into the record.

*of Social Security*, 588 Fed. Appx. 82, 84 (2d Cir. 2015) (permitting reliance on consultative examiners' RFC opinion where record had patient's "complete medical history and treatment notes, which themselves contained multiple psychological assessments"); *Tankisi v. Comm'r of Social Security*, 521 Fed. Appx. 29, 34 (2d Cir. 2013) (excusing lack of medical opinion where ALJ had "voluminous medical record" to consider). In contrast, because there is a dearth of treatment notes from Plaintiff's psychiatric treatment, the ALJ lacked sufficient information in the record to even compare whether the consultative examiners' RFC opinions were consistent with the record. *See Luciano v. Comm'r of Social Security*, No. 16-CV-5963 (GWG), 2017 WL 4326078, at *7 (S.D.N.Y. Sept. 28, 2017). Accordingly, I recommend that the case be remanded to the Commissioner to obtain medical opinions from Plaintiff's mental health treating sources as to her impairment-related limitations and its relation to her ability to work.

   2. **Substantial Evidence**

Because it is unclear whether the record has been fully developed, it is impossible at this time to determine whether each of ALJ Olszewski's determinations were supported by substantial evidence. At step two, ALJ Olszewski determined that Plaintiff suffered from three mental impairments but no severe physical impairment. (Tr. 20). In contrast to the mental health records, there are no obvious gaps in Plaintiff's physical health records as Plaintiff did not indicate any visits that were not reflected in the record. Consequently, ALJ Olszewski properly noted the absence in any of the treating notes of concern regarding Plaintiff's arthritis, gastroesophageal reflux disease, urinary urgency, and anemia. *Id*. Indeed, Dr. Sarnelli's notes state that Plaintiff's lab tests for rheumatoid arthritis returned negative. (Tr. 454-55). The lack of any documented severe arthritis, combined with the consultative examiner

15

Dr. Salon's finding that Plaintiff had no restriction in movement, supports ALJ Olszewski's finding. Similarly, ALJ Olszewski's findings concerning acid reflux and anemia were supported by their absence in any of Plaintiff's treating notes. Plaintiff visited Harlem Hospital multiple times for urinary complaints, but ALJ Olszewski properly noted that medication appeared to keep it under control. (Tr. 21). Further, Plaintiff did not list urinary complaints in her application for SSI and DIB as one of the impairments that prevented her from working. (Tr. 78).

Because steps three through five solely concerned Plaintiff's mental impairments, ALJ Olszewski's findings were not supported by substantial evidence because of the incomplete record on Plaintiff's mental health. ALJ Olszewski's findings only relied on the consultative examiners' opinions[9] and Plaintiff's testimony at the April 20, 2017 hearing. (Tr. 21-26). ALJ Olszewski acknowledged that she attributed great weight to the mental health notes of consultative examiner Dr. Feiden while giving little weight to Plaintiff's testimony. (Tr. 24-26). Although ALJ Olszewski relied on Dr. Feiden's evaluation, ALJ Olszewski gave little weight to Dr. Feiden's actual RFC opinion that Plaintiff's mental health ailments "may significantly interfere with the claimant's ability to function on a daily basis," finding that this opinion was inconsistent with the rest of Dr. Feiden's notes. (Tr. 25). Therefore, ALJ Olszewski's RFC opinion was unsupported by *any* professional opinion, either by a consultative examiner or treating source. Instead, ALJ Olszewski improperly determined Plaintiff's mental capacity based on ALJ Olszewki's own interpretation of Dr. Feiden's notes. *See Hooper*, 199 F.Supp.3d at 816 (finding as error

---

[9] ALJ Olszewski referenced consultative examiner Dr. E. Kamin but discounted his opinion because he used the wrong evaluation standard. (Tr. 25).

the ALJ's rendering a disability determination on own evaluation of treatment notes without the support of any medical opinion).

ALJ Olszewski further improperly discounted Plaintiff's subjective testimony. If the ALJ rejects the plaintiff's testimony as not credible, the ALJ must explain such rejection "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (quoting *Fox v. Astrue*, No. 6:05-CV-1599 (NAM)(DRH), 2008 WL 828078, at *12 (N.D.N.Y. Mar. 26, 2008)). Here, although ALJ Olszewski gave little weight to Plaintiff's testimony because her testimony was "not generally consistent with the medical evidence," ALJ Olszewski only compared Plaintiff's subjective complaints with the evaluation notes of consultative examiner Dr. Feiden and the three treatment notes in the record. (Tr. 24-25). As described above, ALJ Olszewski could not have properly weighed Plaintiff's testimony against the medical record when the medical record included obvious gaps, *i.e.*, only three visits' treatment notes in the face of a history of mental health issues and regular visits with mental health professionals over at least three years. Consequently, because ALJ Olszewski did not have sufficient information to make an RFC determination, any decision on whether Plaintiff could perform her past work or other work in the national economy could not have been supported by substantial evidence.

IV. <u>Conclusion</u>

For the foregoing reasons, I recommend that the Commissioner's Motion for Judgment on the Pleadings be **DENIED** and that the case be remanded to the Commissioner for an

attempt at further development of the record by requesting medical opinions from Plaintiff's mental health treating sources.

V. **Objections**

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be filed with the Clerk of Court and addressed to the Honorable Alison J. Nathan, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Nathan.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from the Commissioner. *See Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

The Clerk is directed to mail a copy of this report & recommendation to Plaintiff at the address listed on the docket.

**SO ORDERED**.

Dated: July 19, 2019  
New York, New York

_s/ Ona T. Wang_  
**Ona T. Wang**  
United States Magistrate Judge